**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Nicholas Johnnidis, individually and on behalf of all others similarly situated, | |
| Plaintiff, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| Verizon Communications Inc. , a Delaware corporation | Case No. |
| Defendants. | |

Plaintiff Nicholas Johnnidis ("Plaintiff" or Dr. Johnnidis) brings this class action against Defendant Verizon Communications Inc. ("Verizon" or  "Defendant") on behalf of himself, and all others similarly situated, to obtain damages, restitution, and injunctive relief for the Class, as defined below, from Defendant.  Plaintiff makes the following allegations upon information and belief, except as to his own actions, the investigation of his counsel, and facts that are a matter of public record:

## NATURE OF THE ACTION

1.     Plaintiff brings this class action against Defendant alleging that Defendant violated New York General Business Law §349 ("New York's Deceptive Practice Act" or "NY DPA"), acted negligently, acted fraudulently, and by its actions was unjustly enriched.

## PARTIES

2.     Plaintiff Nicholas Johnnidis is a resident of Nassau County, New York, and is a customer of Verizon "Plain Old Telephone Service" ("POTS"), utilizing traditional copper lines.

3.     Defendant Verizon Communications Inc. is a Delaware corporation with its principal executive offices at 1095 Avenue of the Americas, New York, New York, 10036.

Verizon is listed and actively trades shares on the New York Stock Exchange under the symbol "VZ." As of the close of the market April 18, 2016, Verizon had a market capitalization of over 200 billion dollars.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d), because the Class contains members of diverse citizenship from Defendant, and because the amount in controversy exceeds $5 million.

5.      This Court has personal jurisdiction over Defendant because Defendant is authorized to, and conducts substantial business in New York, generally, and this District, specifically.  Defendant's headquarters are within this District.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1) because a substantial part of the events and omissions giving rise to this action occurred in this District as Defendant's headquarters are within this District.

## FACTUAL ALLEGATIONS

7.      Plaintiff Nicholas Johnnidis ("Dr. Johnnidis") is a resident of Nassau County, New York, where he has practiced medicine as a dentist for several decades.

8.      Defendant has provided both Dr. Johnnidis' residential and business phone service for over 20 years.

9.      As a medical professional, Dr. Johnnidis must be available to his patients for emergency telephone calls. Dr. Johnnidis has relied on the copper line telephone service of Defendant, which as explained *infra*, is available even when electrical service is interrupted.

10.     Plaintiff's mother Mrs. Johnnidis ("Mrs. Johnnidis") lives with her son Dr. Johnnidis.

11.    Mrs. Johnnidis is over 90 years old and depends on telephone service from Defendant for support in emergency situations.

12.    Around 2 years ago, Dr. Johnnidis began to have trouble with his telephone service from Defendant.

13.    Specifically, when it would rain, Dr. Johnnidis' phone connections began to have loud static in the background.

14.     Dr. Johnnidis called Verizon to repair the lines, and Verizon's representative told him that he should switch to FiOS optical fiber from POTS, because Verizon was phasing out its copper telephone lines.

15.    Dr. Johnnidis told Verizon he wished to keep copper lines for his telephone service. He explained that his mother required the uninterrupted service POTS provides for her emergency monitoring service.

16.    Dr. Johnnidis explained to Verizon's representative that during rainy and wet periods his telephone service experienced static on the line. Verizon's representative told Plaintiff that the POTS line were degrading, and reiterated that Dr. Johnnidis should switch to FiOS optical fiber.

17.    Dr. Johnnidis insisted he wished to keep his existing service over copper wires.

18.    Verizon's representative told Dr. Johnnidis that it would take two weeks before technicians would be available to fix his copper phone lines, but the service could be fixed much sooner if he was to switch to the optical phone service. Dr. Johnnidis stated again to Verizon's representative that he wanted to stick with his present copper line telephone service.

19.    Dr. Johnnidis explained to Verizon's representative that his mother, Mrs. Johnnidis is over 90 years old and has a medical condition that requires an emergency phone line

3

system.

20.     Mrs. Johnnidis relies on "plain old telephone service" (POTS) over copper phone lines because it allows for telephone service even when electrical service to an area is interrupted.

21.     With Verizon's FiOS service, when electrical service to an area is interrupted, a backup battery is necessary to provide telephone service.

22.     Such backup batteries provide service for around 4 to 6 hours, after which time, a FiOS subscriber cannot use the service to make telephone calls.

23.     An April 16, 2016 article on the computer website arstechnica.com[1] explains why copper is still preferred by some customers:

> But there are also customers who don't want fiber because copper lines can often remain in service during long power outages. When we wrote about Verizon's attempts to push these customers onto fiber in August 2014, Karen Anne Kolling of North Kingstown, Rhode Island told us that Verizon employees showed up unannounced on her doorstep to switch her to fiber—a claim Verizon denied.
>
> Nearly two years later, Kolling tells us that she is still trying to maintain her copper line. "When I made a repair appointment a week or two ago, Verizon sent out a fellow who said Verizon was not going to fix copper landline problems and that he was there to install FiOS. I politely told him to go away," Kolling told Ars a few days ago.
>
> Although Kolling's copper line often loses its dial tone during rain storms, she said that it "generally stays available during power failures."

24.     Verizon publically denies that is has abandoned the repair of its copper telephone lines, but many reports over the last several years would suggest otherwise.

25.     For example, in an article dated June 11, 2015, titled "Verizon Is 'Killing the Copper' and Is Now Denying It," the Huffington Post quotes Lowell McAdam, Chairman and

---

[1] http://arstechnica.com/business/2016/04/verizons-fiber-is-the-only-fix-program-upgrades-old-copper-lines/
[2] http://www.huffingtonpost.com/bruce-kushnick/verizon-is-killing-the-co_b_7562660.html

CEO of Verizon Communications, speaking at the Guggenheim Securities Symposium to private investors, on June 21, 2012: "So I am going to be really shrinking the amount of copper we have out there, and then I can focus the investment on that to improve the performance of it." [2]

26.    On June 25, 2015, twenty-nine [29] different consumer groups, including the Communications Workers of America (the "CWA") union (the workers responsible for the actual maintenance and repair of POTS copper lines), wrote a letter (the "Letter") to the Chairman of the Federal Communications Commission. [3]

27.    The Letter stated that Verizon was neglecting its copper telephone lines for fiber optic data lines to "upsell" customers with more expensive services in its FiOS product.

28.    The Letter cited a Wall Street Journal article on June 9, 2015 by Ryan Knutson titled "Verizon's Biggest Union Claims Carrier Isn't Fixing Broken Landlines."[4]

29.    The June 9th article detailed claims that Verizon had abandoned POTS copper line maintenance from the very workers tasked with repairing the copper telephone lines.

30.    Verizon publicly claims that it continues to support its copper telephone lines: in an article on RCR Wireless News, Raymond McConville, media relations manager at Verizon stated: "We remain committed to investing in our wireline networks – both fiber and copper – as evidenced by the billions of dollars we continue to invest in it year in and year out – $5.8 billion last year alone." [5]

31.    An article in philly.com from October 23, 2015 says "The CWA first brought the copper network's condition to state regulators' attention in a letter in early September. The union followed the letter with the formal petition and photos on Wednesday. The union says it has

---

[2] http://www.huffingtonpost.com/bruce-kushnick/verizon-is-killing-the-co_b_7562660.html
[3] https://www.nclc.org/images/pdf/energy_utility_telecom/telecommunications/letter-tech_transition_2015.pdf
[4] http://www.wsj.com/articles/verizons-biggest-union-claims-carrier-isnt-fixing-brokenlandlines-1433853524
[5] http://www.rcrwireless.com/20150609/carriers/verizon-denies-claims-that-it-is-abandoning-landlines-tag4

more than 100 photos that depict a range of neglect in non-FiOS areas." [6]

32.     In an April 16, 2016 article, Philly.com reported it had uncovered an internal

Verizon memo titled "Fiber Is the Only Fix"[7] which states:

> Verizon customers with copper-line phones who call twice in 18 months for repairs - or live near someone who does - are likely to get a surprise when company techs show up at their door.
>
> They will be told that their "only fix" is to replace decades-old copper line with high-speed fiber as Verizon won't fix the copper, according to company documents obtained by the Inquirer….
>
> Seeking to quicken the network modernization, Verizon has developed an internal process to switch a copper-line customer who calls for a repair.
>
> The customer is told that a technician truck will roll for repairs. Verizon's customer-service system then generates two tickets on the repair call: one for a repair and a second, called a "ghost service order," to replace the copper with a fiber connection.
>
> Once at the customer's home, the Verizon technician tells the customer that the only solution is to switch to fiber, which includes the installation of a FiOS box.
>
> If a flagged copper customer needing repairs ultimately declines fiber upgrade, the Verizon document commands: "Do not fix trouble" with the copper line.

33.     In fact, Verizon stated to private investors and analysts in 2012 its intention to

"flip" all of its copper telephone line customers ("POTS") to fiber optic data lines ("FiOS").

34.     During a September 20, 2012 Goldman Sachs Communacopia Conference, Fran

Shammo, Verizon's Chief Financial Officer, said:

> So by getting the systems to identify when they call in for trouble that we automatically go out and not repair the copper but immediately flip them over to FiOS. So we've gotten better through that as the year has gone and I think again you will see some acceleration here going into '13 with the systems and training the techs and everything else.

---

[6] http://articles.philly.com/2015-10-23/business/67648449_1_cwa-copper-FiOS
[7] http://articles.philly.com/2016-04-11/business/72213020_1_FiOS-verizon-customers-fiber

So I think we're on a good path here and this is -- this will really start to benefit us two ways, quite honestly. One is what we are seeing is as customers convert to FiOS, even if they are just voice and DSL over to voice and Internet, what we are seeing is once we connect them up to the Internet, they see the speed, they are buying up the bundle. So we are seeing accretion from these customers that we are migrating.

And then of course just the operating cost of getting off of that copper on to FiOS significantly reduces our operating costs. So there is a twofold benefit and, quite honestly, Lowell keeps enforcing we need to do more and I think the business is scaling to get more done. [8]

35.     The text of Ms. Shammo's remarks at the September 20, 2012  conference was no longer available on either the Verizon or Goldman Sachs websites: it was retrieved from a web archive of a page that was once found on the Verizon webpage, but is no longer made available by Verizon.

36.     Verizon needs to have consumers and the public continue to believe it is maintaining its copper telephone lines because Verizon charges POTS customers fees for maintaining its copper lines: fees which have been diverted from POTS maintenance and used elsewhere by Verizon.

37.     On March 27, 2016 a New York Post article titled "Verizon is supposedly screwing its landline customers" states: "The 2 million or so New York state residents who still get dial tones from Verizon landlines were overcharged $1,000 to $1,500 apiece over the last few years…." [9]

38.     Verizon uniformly charges maintenance fees to its customers to maintain its networks, such as its "Subscriber Line Charge/Access Charges - The Subscriber Line Charge is a

---

[8] "SEPTEMBER 20, 2012 / 12:00PM, VZ - Verizon at Goldman Sachs Communacopia Conference" http://web.archive.org/web/20130602185839/http://www22.verizon.com/investor/DocServlet?doc=goldman_vz_transcript_092012.pdf
[9] http://nypost.com/2016/03/27/verizon-is-supposedly-screwing-its-landline-customers/

fee that helps telephone companies, such as Verizon, recover costs for maintaining outside telephone wires, underground conduits, telephone poles, and other necessary facilities and equipment." [10]

39.     Verizon also uniformly charges its customers a "Municipal Franchise Fee/Right of Way Fee - This monthly Verizon surcharge recovers Verizon's costs where a jurisdiction charges Verizon for the use of the municipal public right of way to provide telecommunications services. This fee is generally charged per telephone line and may be referred to on your bill as a Municipal Franchise Fee, Right of Way Fee or State Infrastructure and Maintenance Fee."

40.     These fees are fraudulent to all Verizon POTS customers, because Verizon says it is providing a service it does not in fact provide. These statements are uniformly fraudulent to all Verizon POTS customers

41.     Copper telephone line Verizon customers are charged these maintenance fees, but are not given any maintenance service to their copper telephone lines in return, unjustly enriching Verizon.

42.     In fact, the right-of-way that Verizon claims to allow it string its copper telephone lines across private property does not apply to fiber optic data lines, which carry service other than telephone service.

43.     Verizon has also told state and federal regulators that the cost of POTS merits a charge of around $27 per customer.

44.     The actual cost to maintain and provide its current level of service to POTS customers is far less according to the March 27th Post article.

45.     The New York State Public Service Commission ("NYPSC") compiled a report in

---

[10] Verizon Billing Glossary https://www.verizon.com/support/consumer/account-and-billing/billing-glossary

2015 titled "Staff Assessment of Telecommunications Services" which stated "All incumbent and certified competing telephone providers in New York are required to keep and retain performance records for each metric contained in the Commission's regulation at 16 NYCRR §603.3. In addition, these companies are expected to meet or exceed the Commission's performance thresholds." [11]

46.     Verizon must continue to convince the NYPSC and other regulators that its copper telephone line network meets or exceeds the Commission's performance thresholds. It currently does not meet or exceed that threshold.

47.     Verizon uniformly tells the public that funds collected and allocated for maintaining its copper telephone lines are used for that purpose, but they are not.

48.     In 2012, Fran Shammo, Verizon's Chief Financial Officer, stated to private investor representatives at Goldman Sachs that the copper telephone line construction budgets have been diverted, to charge regulated wireline budgets for the less regulated wireless affiliate's construction needs.

> The fact of the matter is Wireline capital -- and I won't get the number but it's pretty substantial -- is being spent on the Wireline side of the house to support the Wireless growth. So the IP backbone, the data transmission, fiber to the cell that is all on the Wireline books but it's all being built for the Wireless Company. [12]

49.     Verizon's fraudulent and deceptive practice of charging its copper telephone line customers for network maintenance that it does not in fact perform is done to continue to allow Verizon to reap profits Verizon is not entitled to at the expense of its older copper telephone line customers.

---

[11] http://documents.dps.ny.gov/public/Common/ViewDoc.aspx?DocRefId=%7b3DDDC8A5-E94A-4873-886C-3D73F68EC9AB%7d

[12] "SEPTEMBER 20, 2012 / 12:00PM, VZ - Verizon at Goldman Sachs Communacopia Conference" *supra.*

50.     Verizon continues to pretend it maintains its copper telephone line network, *inter alia*, to continue to allow Verizon right-of-way to string and maintain its FiOS fiber optic data lines across private property under color of right, to pretend to meet its obligations to state and federal regulators, and to charge copper telephone line customers moneys in fees for maintenance and services it does not in fact provide, at a cost that is a fraction of the cost Verizon has told regulators.

51.     It is not just in New York and Pennsylvania that Verizon is neglecting its copper telephone line network.

52.     On December 3, 2015, the computer website arstechnica.com story titled "Towns want Verizon investigated for abandoning networks through neglect" (the "arstechnica.com Article") chronicled "Sixteen cities and towns in New Jersey [that] have asked the state to investigate Verizon, claiming that the telecommunications company 'has, through neglect, abandoned and retired its copper landline infrastructure in most of South Jersey.'" [13]

53.     The arstechnica.com Article went on to quote Hopewell Township Committeeman Gregory Facemyer: "In more affluent communities, Verizon has begun to phase out copper with more modern fiber" while "ignoring these issues in communities like ours." *Id.*

54.     Where Verizon did not believe it could profitably replace its copper telephone lines with fiber optic data lines and upsell more expensive products to its customers, it abandoned maintenance of those lines entirely.

55.     Verizon was quoted in the arstechnica.com Article:

Verizon is committed to providing quality service to all of our customers, regardless of where they are.  Verizon's multi-billion investment in its wireline network over the last decade reflects that commitment as well as the fierce

---

[13] http://arstechnica.com/business/2015/12/towns-want-verizon-investigated-for-abandoning-networks-through-neglect/

competition for communication services that exists across the state, including South Jersey. It is in Verizon's best interest to not only meet our customers' expectations but to offer the products and services they demand.  We will continue investing throughout the state to ensure that the services provided over our network remain the most reliable and most desirable options for local consumers.

This commitment extends to the more rural parts of the state, where Verizon is investing to maintain reliable service on its network in those areas. Verizon continues to dedicate substantial resources to the maintenance of its copper infrastructure for the benefit of its customers in Southern New Jersey through its Proactive Preventative Maintenance Program.

56.     Verizon continues to make conflicting statements: stating in private it is abandoning copper telephone lines in favor of more profitable fiber optic data lines to investors, but stating in public it continues to support and maintain its copper telephone lines despite what its union, the facts, the newspapers, and lawmakers might say.

57.     As quoted *supra*, Lowell McAdam, Chairman and CEO of Verizon Communications and Fran Shammo, Verizon's Chief Financial Officer both privately stated to investors in 2012 that Verizon was walking away from its copper telephone line networks.

58.     Verizon makes these deceptive statements in the common course of its service to consumers.

59.     Verizon makes these common, uniform fraudulent statements in the course of its service to consumers.

60.     Verizon will continue to wrongfully collect maintenance fees and ignore its responsibilities to maintain its copper telephone line network absent injunctive relief.

61.     Verizon will continue to collect inflated service fees for POTS copper telephone line service (currently around $27 dollars per customer) absent injunctive relief

62.     Verizon was unjustly enriched by collection of maintenance fees from copper telephone line customers as described in this Complaint.

## CLASS ACTION ALLEGATIONS

63.     Plaintiff seeks relief in his individual capacity and seeks to represent a class

consisting of all others who are similarly situated.  Pursuant to Fed. R. Civ. P. 23(a) and (b)(2)

and/or (b)(3), Plaintiff seeks certification of a national class.  The national class is initially

defined as follows:

> **All persons who were Verizon copper telephone line customers**
> **who were charged network maintenance fees.**
>
> Excluded from the Class are Defendant's officers, directors, and
> employees; any entity in which Defendant has a controlling
> interest; and the affiliates, legal representatives, attorneys,
> successors, heirs, and assigns of Defendant.  Excluded also from
> the Class are members of the judiciary to whom this case is
> assigned, their families and members of their staff.

64.     Numerosity.  Fed. R. Civ. P. 23(a)(1).  The members of the Class are so numerous

that the joinder of all members is impractical.  While the exact number of Class members is

unknown to Plaintiff at this time, based on information and belief, it is in the millions.

65.     Commonality.  Fed. R. Civ. P. 23(a)(2) and (b)(3).  There are questions of law

and fact common to the Class, which predominate over any questions affecting only individual

Class members.  These common questions of law and fact include, without limitation:

    a.  Whether Defendant used funds from copper telephone line customers to

        adequately maintain copper telephone line networks;

    b.  Whether Defendant uniformly overcharged its customers for POTS;

    c.  Whether Defendant deceptively told POTS customers that it used funds allocated

        to adequately maintain copper telephone line networks;

    d.  Whether such uniform statements were fraudulent;

    e.  Whether such uniform statements constitute a deceptive practice under the DPAs

        of New York and the various states;

    f.   Whether Defendant was unjustly enriched from collection of network maintenance fees from its copper telephone line customers;

    g.   Whether Defendant was unjustly enriched from the use of private land to maintain its fiber optic data lines under mandates addressing only copper telephone lines;

    h.   Whether Defendant's conduct caused harm to Plaintiff and the Class;

    i.   Whether Defendant's conduct violated New York General Business Law **§** 349;

    j.   Whether Defendant breached its implied contract to Plaintiff and the Class; and

    k.   Whether Plaintiff and the Class are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

66.    <u>Typicality</u>.  Fed. R. Civ. P. 23(a)(3).  Plaintiff's claims are typical of those of other Class members because Plaintiff's information, like that of every other class member, was misused and/or disclosed by Defendant.

67.    <u>Adequacy of Representation</u>.  Fed. R. Civ. P. 23(a)(4).  Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff's Counsel is competent and experienced in litigating class actions.

68.    <u>Superiority of Class Action</u>.  Fed. R. Civ. P. 23(b)(3).  A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable.  Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims.  There will be no difficulty in the management of this action as a class action.

69.    Damages for any individual class member are likely insufficient to justify the cost of individual litigation, so that in the absence of class treatment, Defendant's violations of law

inflicting substantial damages in the aggregate would go un-remedied without certification of the Class.

70.    Defendant has acted or refused to act on grounds that apply generally to the class, as alleged above, and certification is proper under Rule 23(b)(2).

## COUNT I
### Violation of New York General Business Law § 349
### (On Behalf of New York Consumers)

71.     Plaintiff incorporates the substantive allegations contained above if fully set forth herein.

72.      Plaintiff brings this claim individually and on behalf of New York Class members.  Plaintiff and New York Class members are individuals who reside in New York and who were customers of Verizon in their copper wire telephone service.

73.     As described in paragraphs 32 - 34, Verizon charged Plaintiff and New York Class members fees to maintain its telephone network.

74.     Verizon did not maintain the copper wire telephone network providing service to Plaintiff and New York Class members.

75.     Verizon stated and continues to state publically to customers, like Plaintiff and New York Class members, that it is maintaining these copper wire telephone networks.

76.      Verizon states at private investor conferences that it is in reality abandoning those networks in favor of the cheaper and more profitable fiber optic data lines.

77.     As fully alleged above, Defendant engaged in unfair and deceptive acts and practices in violation of **§** 349 of the New York General Business Law.

78.     Reasonable consumers would be misled by Defendant's misrepresentations and/or omissions concerning the reliability of telephone service, the maintenance by Verizon of copper telephone lines, the "massive" investment by Verizon in its copper wire telephone networks.

79.     Defendant did not inform customers such as Plaintiff and New York Class members that in reality it had diverted money from its copper wire telephone networks to its fiber optic data lines and was allowing its copper telephone lines to fall into disrepair.

15

80.     Plaintiff seeks restitution on behalf of New York Class members for any and all overcharges, or the statutory amount of damages, whichever is greater.

81.     Plaintiff also seeks injunctive relief on behalf of New York Class members in the form of an order (1) compelling Defendant to maintain copper telephone lines to its customers or (2) compelling Defendant to stop charging fees for such maintenance.

82.     Plaintiff seeks attorney's fees and damages to the fullest extent permitted under N.Y. G.B.L. § 349(h).

**COUNT II**
**Breach of Implied Contract**
**(On Behalf of Plaintiff and All Other Similarly Situated Consumers)**

83.     Plaintiff incorporates the substantive allegations above as if fully set forth herein.

84.     Plaintiff brings this claim individually and on behalf of a nationwide Class of consumers.

85.     Defendant marketed and sold telephone services to Plaintiff and Class members.

86.     Defendant uniformly billed those customers monthly, even where a contract did not exist between Defendant and the customer.

87.     Defendant would keep providing service as long as the customer remained current in his or her account.

88.     Plaintiff and Class members accepted Defendant's offers, paid all fees, taxes, surcharges and the like charged by Verizon under color of right to provide telephone service over copper telephone lines.

89.     If an individual did not pay Defendant all fees, taxes, surcharges and the like charged by Verizon, Verizon would stop supplying service to that individual

90.     While Plaintiff and Class members paid for telephone service, the service over

their copper telephone lines was subpar and below standard.

91.     Plaintiff and Class members would not have paid Verizon to provide telephone service over copper telephone lines if they had known they would not get the benefit of their bargain: i.e.: reliable, standardized telephone service with standard quality, at a reasonable cost.

92.     Plaintiff and Class members fully performed their obligations under the implied contracts with Defendant.

93.     Defendant breached the implied contracts it made with Plaintiff and Class members by failing to provide adequate and standard quality telephone service to Plaintiff and Class members.

94.     As a direct and proximate result of Defendant's breaches of the implied contracts between Defendant and Plaintiff and Class members, Plaintiff and Class members sustained actual losses and damages as described in detail above in this this Class Action Complaint.

**COUNT III**
**Unjust Enrichment**
**(On Behalf of All Plaintiff and All Other Similarly Situated Consumers)**

95.     Plaintiff incorporates the substantive allegations contained above as if fully set forth herein.

96.     Plaintiff brings this claim individually and on behalf of a nationwide Class.

97.     Plaintiff and Class Members conferred a monetary benefit on Defendant in the form of monies paid for the purchase of goods and services from Defendant.

98.     Defendant has knowledge of the benefits conferred directly upon it by Plaintiff and Class members.

99.     A portion of the monies paid for the purchase of services by Plaintiff and Class members to Defendant was supposed to be used by Defendant, in part, to pay for the

17

maintenance of the copper telephone line network.

100.    Defendant failed to provide repairs and service to the copper telephone lines that provided telephone service to Plaintiff and Class members.

101.    Plaintiff and Class members overpaid Defendant for the POTS tendered by Verizon.

102.    The actual cost for Verizon to provide POTS is a fraction of the $27 it charges customers.

103.    Defendant has been unjustly enriched because it has retained the portion of Plaintiff's and Class members' money that was supposed to provide repairs and service to the copper telephone lines that provided telephone service to Plaintiff and Class members.

104.    Defendant has been unjustly enriched because it overcharged Plaintiff and Class members for POTS.

105.    It would be inequitable for Defendant to retain the portion of Plaintiff's and Class Members' money that was meant to provide maintenance and service to the copper telephone lines, because Defendant misrepresented it made such repairs, performed such maintenance and service, when in fact it did not; causing injuries to Plaintiff and all Class members.

106.    It would be inequitable for Defendant to retain the portion of Plaintiff's and Class Members' money that Defendant overcharged Plaintiff and all Class members for POTS that cost a fraction of what Defendant told regulators and Plaintiff and all Class members it cost.

107.    Plaintiff and Class members were (and continue to be) injured and have suffered (and will continue to suffer) the damages described in detail above, and seek restitution related to it.

108.    Plaintiff seeks restitution or disgorgement of Defendant's ill-gotten gains.

## COUNT IV
## Common Law Fraud
### (On Behalf of All Plaintiff and All Other Similarly Situated Consumers)

109.     Plaintiff incorporates the substantive allegations contained above as if fully set forth herein.

110.     Defendant uniformly billed its customers $27 monthly for service that cost Defendant a fraction of that amount to provide.

111.      As described above, Defendant uniformly billed its customers monthly fees for maintenance of POTS it never performed.

112.     Defendant performed these actions intending to deceive Plaintiff and Class members.

113.     Defendant acted with intend and motive to deceive regulators and government officials that it was providing and maintaining POTS while instead diverting money and service to its more lucrative FiOS product.

114.     If Defendant did not deceive regulators and government officials that it was providing and maintaining POTS, it would not has received the many regulatory benefits of being a telephone utility: *i.e.*: it would not have been allowed to continue to utilize public rights of way and the like to string its lines, which were meant for POTS but which instead Defendant used for FiOS.

115.     These facts and others stated *supra* give rise to a strong inference of Defendant's *scienter,* to show Defendant's acts constitute fraud.

### JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in their favor and against Defendant, as follows:

A.     For an Order certifying this action as a class action and appointing Plaintiff and their Counsel to represent the Class;

B.     For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the collection of funds from Plaintiff and Class members for repairs, maintenance, and service to the copper telephone lines that provided telephone service to Plaintiff and Class members;

C.     For equitable relief compelling Defendant to adequately maintain its copper telephone lines to the standards required under federal and state statues;

C.     For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

D.     For an award of actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined;

E.     For an award of punitive damages;

F.     For an award of costs of suit and attorneys' fees, as allowable by law; and

G.      Such other and further relief as this court may deem just and proper.

Dated: May 9, 2016

_____
Paul C. Whalen, (PW1300)
**LAW OFFICES OF PAUL C. WHALEN, P.C.**
768 Plandome Road
Manhasset, New York 11030
Tel: (516) 627-5610
Fax: (212) 658-9685

**JONES WARD PLC**
Jasper D. Ward IV
Alex C. Davis
Marion E. Taylor Building
312 S. Fourth Street, Sixth Floor
Louisville, Kentucky 40202
Tel. (502) 882-6000
Fax (502) 587-2007
jasper@jonesward.com
alex@jonesward.com

*Counsel for Plaintiff and the Proposed Class*